THOMSON–HOUSTON ELECTRIC CO. v. OHIO BRASS CO. et al.

(Circuit Court, D. Massachusetts. April 27, 1904.)

No. 1,236.

1. PATENTS—INVENTION—TROLLEY CROSSINGS AND SWITCHES.

The Van Depoele patents, No. 393,278 and No. 396,313, both relating to crossings or switches for overhead electric conductors, were not anticipated or rendered void for lack of invention by the fact that railroad switches and crossings previously in use were somewhat similar in construction and principles of operation, the adaptation of such principles to an underrunning trolley system, and the construction of mechanism therefor, requiring more than mere mechanical skill; nor is there anything anticipatory in prior patents for store-service systems. Claims 4, 5, and 6 of the former patent, and 1, 2, and 3 of the latter, also *held* infringed.

2. SAME—PRIOR ART—PUBLICITY.

An application for a patent filed prior to a patent in suit can have weight as an anticipation only if there has been some actual use of the invention, so that there are elements of publicity; the application itself not being sufficient to make the invention a part of the prior art.

3. SAME—SEPARATE PATENTS FOR VARIATIONS OF SAME STRUCTURE.

A modification of the device of a patent to adapt it to different situations and wider use may be made the subject of a second patent, where it involves invention, although both inventions may have been made at the same time.

In Equity.

Thomas J. Johnston, for complainant.

Edmund Wetmore and Macleod, Calver & Randall, for defendants.

HALE, District Judge. This suit in equity is for infringement of claims 4, 5, and 6 of letters patent No. 393,278, dated November 20, 1888, to Charles J. Van Depoele, for crossing or switch for overhead electric conductors; also for infringement of claims 1, 2, and 3 of letters patent No. 396,313, dated January 15, 1889, to the said Charles J. Van Depoele, for adjustable crossing and switch for overhead conductors.

Claims 4, 5, and 6 of patent No. 393,278 are as follows:

"(4) A crossing or switch for electric conductors, comprising arms connected with and radiating from a plate or surface in electrical connection with said arms, and a conductor attached to each arm, the extremity of an entering conductor being located opposite to the continuation of said conductor leaving the crossing, substantially as described.

"(5) A crossing or switch for electric conductors, comprising arms connected with and radiating from a plate or surface in electrical connection with said arms, a conductor attached to each arm, the extremity of an entering conductor being located opposite to the continuation of said conductor leaving the crossing, and a projection or flanges upon the plate to prevent lateral displacement of the trolley wheel, substantially as described.

"(6) A crossing or switch for electric conductors, comprising arms connected with and radiating from a centrally located plate or surface in electrical connection with said arms, a conductor attached to each arm, the extremity of an entering conductor being located opposite to the continuation of said conductor leaving the crossing, and a projection upon the central plate arranged to engage the contact device to prevent lateral displacement there-

of when passing upon the plate between the ends of the conductors, substantially as described."

Claims 1, 2, and 3 of patent No. 396,313 are as follows:

"(1) A crossing or switch for suspended electric conductors, comprising two or more adjustably connected members adapted for attachment to the respective conductors, substantially as described.

"(2) A crossing or switch for suspended electric conductors, comprising two or more adjustably connected members and electric conductors secured to the said members, substantially as described.

"(3) A crossing or switch for electric conductors, comprising a contact or surface, members connected in adjustable relation thereto and extending from the surface, and ribs or extensions upon the members to which the conductors are attached, substantially as described."

The defenses in the case are that the patents involve no invention, that they have been anticipated, and that they have not been infringed. The specification of the first patent states:

"My invention relates to improvements in switches for suspended electric conductors. My improved switches are also applicable to other uses, and may be employed in connection with electric conductors otherwise placed; but, for illustration, I have shown them applied to aerial lines only."

In further describing the arrangement, construction, and operation of his said invention, the patentee describes only suspended or overhead electric conductors.

The use of these patents is stated by the complainant to be in connection with the Van Depoele electric railway system, which consists of an underrunning, upwardly pressed trolley, in combination with a line-wire conductor hung from above, so as to co-operate with the trolley in supplying current to the moving vehicle on the track below.

Claims 1, 2, and 3 of the second patent in suit add the adjustable feature to the crossing described in the claims at issue of the first patent. It is impossible to use a right-angled crossing at an acute-angled intersection. Such attempted use would throw a trolley off the track. Adjustability of the arms or ribs is required to make the first patent adaptable to all situations. This feature is the only matter brought before the court by the second patent.

The defenses of anticipation and of no invention are based upon the claim that the principle of the invention is involved in patents relating to railroad frogs and crossings, car replacers, and store-service apparatus, as well as to certain overrunning electric railway trolleys. In the unpatented art, defendant claims also the prior use in 1888 of a switch at Harrisburg, Pa.

On inquiry into the state of public knowledge in the art at the date of these patents, we find that the case does not show any prior structure embracing a crossing for an underrunning trolley. It is, however, claimed that certain patents for railroad frogs embody a principle which may be applied to such crossing, and that they render the patents in suit void for want of invention. Reference is made to two patents showing a construction of railroad frogs where the rails of one track cross the rails of another track. These frog patents disclose. methods by which the wheel of the car is engaged with the rail in the manner similar to the method by which the trolley passes from one arm to the other of the contact plate. They present some sugges-

tions for, and similarities to, the construction of the crossing patents in suit. Can they be regarded as a proper and controlling reference in the art involved in these patents? Or do the patents in the under-running trolley system present a new use and a new result, different from anything shown us relating to railroad crossings?

In Potts v. Creager, 155 U. S. 597, 15 Sup. Ct. 194, 39 L. Ed. 275, the Supreme Court has settled the principle relating to the transfer of devices from one art to another. Mr. Justice Brown in that case says:

"As a result of the authorities upon this subject, it may be said that, if the new use be so nearly analogous to the former one that the applicability of the device to its new use would occur to a person of ordinary mechanical skill, it is only a case of double use; but, if the relations between them be remote, and especially if the use of the old device produce a new result, it may at least involve a use of the inventive faculty. * * * Indeed, it often requires as acute a perception of the relation between cause and effect, and as much of the peculiar inventive genius which is characteristic of great inventors, to grasp at the idea that a device used in one art may be made available in another, as would be necessary to create the device de novo."

He applies the following test:

"What alterations were necessary to adapt the device to this new use, and what was the value of such adaptation, and what value has such adaptation been to the new industry?"

This leading case of the Supreme Court is discussed suggestively and forcibly by Judge Coxe in Electric Vehicle Company v. Winton Motor Carriage Company (C. C.) 104 Fed. 814. In Guaranty Trust Company v. New Haven Gaslight Company (C. C.) 39 Fed. 268, Judge Wallace says:

"The fact that the older organizations which it is now claimed were susceptible of being modified by mere mechanical skill into the apparatus of the patent remained without any modification until the patentee made it, and his improvement, when made, was so useful and valuable as to commend itself at once to those skilled in the art to which it relates, is sufficient to resolve any doubt whether the improvement embodies invention in favor of the patent."

The test which the English authorities apply is that, when there is an application of an old invention to a new purpose, such application is regarded as patentable, if there is some novelty in the method of using it. Those authorities go to the extent of holding that a patent may be granted for applying an old machine to an analogous purpose if the result is a "new machine," although that machine may contain old and well-known mechanical appliances. Edmunds on Patents, p. 44, and cases cited. In the Second Circuit, in Thomson-Houston Electric Co. v. Elmira & H. Railway Company, 71 Fed. 400, 18 C. C. A. 145, the court discussed briefly the question whether it would involve invention to invert the track frog and unite it with electrical conductors in an overhead crossing, but did not find it necessary to decide the question. In speaking of a switch plate very similar to the contact plate of the patents before us, the court said:

"The switch plate of the patents is peculiarly adapted for use with a light, flexible conductor. * * * The ordinary track frog, as a structural device, has only a remote resemblance to it. The suggestion that it could be utilized

in an overhead line-wire junction would seem ludicrous, and it could only be done by denuding it of its most conspicuous characteristics."

The court finds some valuable suggestion in the above expression of Judge Wallace. We also find instruction of value in the cases cited and quoted, and in the English authorities to which we have referred in the text citation. From all the instruction which we can derive from the cases, and from a careful study of the exhibits and models, we have no hesitation in concluding that these patents in the underrunning trolley system present a new result, and practically what the English authorities call a "new machine." It seems clear to the court that it required more than mere mechanical skill to reorganize and invert the ordinary frogs and switches of a railroad track, and apply their principles to the use of suspended conductors in an electric railway system. Such reorganization and application do not create what the Supreme Court calls a "double use." Assuming that the patentee's attention was called to railroad frogs upon surface tracks, we believe that it involved invention to transfer such use to the overhead line-wire as used in the underrunning trolley system. Even assuming that there was mere transference of uses, such transference, with the necessary adaptation, involves more than the act of the mechanic, and should be protected by the court. As to the value of such adaptation, the testimony clearly indicates that the underrunning trolley and the suspended conductor have taken their place in nearly all the electric railway mileage of the country. The great use to which these patents have been put should have some weight with the court in resolving any doubt that might exist as to whether the inventive faculty has been employed in the matter of adapting old uses to new results.

The defendants also refer to the car replacer patents, and urge that they are important, especially in relation to the adjustable features of the second patent. It appears from the exhibit and model before us that the car replacer is a track-frog having one part adjustable, so that the wheel of a car which is off the track may be brought up to ride over the rail, and thus be placed upon the track, and that it is very little more than an adjustable switch, so arranged as to put a derailed car back upon the track. It is well suggested by the complainant that, if this may be differentiated from a railroad frog, then the devices of the patents at bar may be held to be patentably different from the railroad frog as well as from the car replacer.

The cash carrier patents are also referred to by the defendant. These patents bring before us double-track store-service constructions, in which a light car is used to carry cash from one part of a store to another. They do not seem to us to show anything which meets the description in the claims of the patents in suit. There is no single wheel with any device for preserving the alignment of the wheel traveling upon one conductor in passing across any intermediate gap to another. There seems to be nothing to suggest the method of crossing the contact plate. In the cash carrier system, there is no problem analogous to that of forcing the trolley to remain in contact with the trolley wire while the car pursues its own course, guided by another track. Certain patents for an overrunning trolley are also cited as af-

fecting the validity of the patents in suit, but they present no method of crossing which suggests the method of the inventions before us in this case.

Other patents of the patentee are also urged as references. Upon examination of these patents, we find that none of them can be sustained as vital in the matter of anticipation, or as affecting the validity of the patents before us. Nearly all of them are later patents which cannot form a valid defense to the earlier patents.

References are also made to certain patents which are subsequent to those in suit, although their applications appear to have been filed prior to the issue of these patents. The study of the prior art in a patent case is necessary in order to prevent the unlawful appropriation of the invention of another, when that invention had become public. An application prior to the patent in suit can have weight only if there has been some actual use of the invention, so that there may be elements of publicity. Such an application cannot be said to be a part of the prior art unless this element of publicity is present.

In the unpatented art, the defendants cite the Wetmore switch, at Harrisburg, in 1888, as involving the principle of guidance by the groove of the trolley wheel. They insist that the switch is the kind of device shown in the cross-over of the patents in suit. The proof of the use of this switch is rather vague; but if we assume that its use is proved, there appears to us to be an entire want of identity of function with the crossing claimed in these patents. As a matter of fact, it was never modified into a crossing. The patents speak interchangeably of a switch and crossing. This interchangeability is liable to be misleading. A switch presents a distinct and different element from that of a crossing. The purpose of a switch is to direct a car from the course. The purpose of a crossing is to keep it on its course. There is an obvious anomaly in making a switch in the prior art a reference for a crossing, but, if there is any element in the switch which may properly be the subject of such reference, the same element was present in a switch which the complainant is shown to have used at Montgomery, Ala., at a time previous to the use of the Wetmore switch.

After a full examination of the prior patented art, and of the condition of public knowledge in the unpatented art, we must conclude that the evidence before us shows an arrangement and adaptation of mechanical appliances in the patents in suit, some of which were old, but which, taken together, produced a new and useful result by a method different from any old method. In coming to this conclusion, we follow Judge Colt in Tannage Company v. Donallan (C. C.) 93 Fed. 912, where he decides that some weight should be given to the fact that a patent has proved successful, and has made a great impression upon the art in which it has its field of operation. The court should properly give some regard to the fact that an invention has met with public acceptance, and has proved a practical and desirable improvement. In Boyer v. Keller Tool Co. (C. C. A.) 127 Fed. 130, a case just decided, the court gives great weight to this consideration. Judge Archbald says:

"Convinced, as we are, that the plaintiff has supplied features that have brought success, where others who had preceded him failed, we are not in-

clined to scan narrowly the means by which it has been obtained. The mechanical elements combined are, no doubt, old, and so, to a certain extent, may be the result accomplished. But nowhere do we find the same combination employed to produce it, and the efficiency attained is so much in advance of that which had gone before as of itself to suggest, if it does not prove, the exercise of inventive skill."

The following authorities are important, touching this element of the case: Palmer v. Johnston (C. C.) 34 Fed. 336; Smith v. Vulcanite Co., 93 U. S. 436, 23 L. Ed. 952; Union Biscuit Co. v. Peters (C. C. A.) 125 Fed. 601; Guaranty Trust Co. v. New Haven Gaslight Co. (C. C.) 39 Fed. 268; Sessions v. Romadka, 145 U. S. 29, 12 Sup. Ct. 799, 36 L. Ed. 609; Hobbs v. Beach, 180 U. S. 383, 21 Sup. Ct. 409, 45 L. Ed. 586; Taylor v. Sawyer Spindle Co., 75 Fed. 301, 22 C. C. A. 203; National Brake Beam Co. v. Interchangeable Brake Beam Co., 106 Fed. 693, 45 C. C. A. 544; Stevenson v. McFassell, 90 Fed. 707, 33 C. C. A. 249.

In reference to the second patent, it is urged by the defendants that the adjustable feature to which it relates does not show patentability. To adapt the first patent to all situations seems to us rather more than a mere mechanical problem. Even if the element of patentability in the second patent should be held to be broadly a part of the inventive conception presented by the first patent, it seems to us to present a patentable improvement and adaptation of the device to places where such device could not be used under the first patent. Where there are two inventions in the same structure, the law does not require them both to be claimed in the same patent. In Thomson-Houston Electric Co. v. Elmira & H. Ry. Co., cited supra, Judge Wallace says:

"While two or more inventions residing in the same combination or structure may be covered by a corresponding number of claims in a single patent, the law does not require them all to be claimed in the same patent, and the inventions may, at the option of the patentee, be secured by different patents. It is quite immaterial that both inventions originate at the same time, and from a single conception."

We think that the invention of the second patent discloses a patentable element, which should be recognized by the court.

Have these patents been infringed? The learned counsel for the defense argues with great force and ability that defendants' device does not infringe, because it presents a case of the electric wires passing uncut above the contact plate, whereas the claim of the patent alleged to be infringed assumes that the wires, in passing below the contact plate, are cut. It contains the following limitation: "The extremity of the entering conductor being located opposite to the continuation of such conductor leaving the crossing." On examination of the specification, we find that a description of the arrangement, construction, and operation of the invention clearly shows that the purpose of the cutting of the wire is to provide for the passage of the trolley wheel across the interrupted trolley line without interference. The problem before the mind of the patentee was to provide "for the passage of the trolley wheel without any change in its horizontal plane, so that no jerking, jumping, and consequent sparking will take place." This is done in the manner shown in the claim; but the patentee, in his specification, refers to the method of arranging the main conductor to

cross the upper side of the plate, instead of being cut, and illustrates this method by drawings. This manner of passage is clearly an equivalent of the way named in the claim. The same result is obtained by a method not functionally different.

The doctrine of equivalents has been fully stated by the Court of Appeals of this circuit in Reece v. Globe Company, 61 Fed. 958, 10 C. C. A. 194. In that case a form of machine not mentioned in the specification was held to be an equivalent of that set forth in the specification and claims. In the case at bar the patentee has mentioned a form or method which is clearly an equivalent of the method stated in the claim. If he had not mentioned it in the specification, he would not be debarred from claiming it as an equivalent. By mentioning it he has not sought to establish another invention, and so cannot be held to have abandoned it. He clearly ought not to be held to be in any worse position than he would have been if he had not mentioned it. In Boyer v. Keller Tool Co., a case just decided, cited supra, the doctrine of equivalents is stated with great clearness by the court. The case presents facts which make the decision of value in the case at bar. In speaking of the throttle valve which was an element of a combination in question in that case, the court said:

"This they have located the same as the plaintiff, in the grasping portion of the handle, and it operates equivalently to control the admission of fluid pressure into and through the duct. So far as claims 42 to 45 are concerned, no particular form of construction or mode of operation is specified in them, and none is, therefore, to be imposed. The combination is simply of a throttle valve in the handle, in conjunction with a supply duct running through it, and that is all that is required to fulfill their terms. It is true that the inventor, in his specifications, describes a particular kind of valve, the same as shown in his drawings and in the diagram above; and, while a device of that general character may be called for, he expressly declares, as we have already seen, that he does not intend to limit himself with regard to the different parts of his invention—a reservation sufficient, as it would seem, to overcome the customary formula, 'substantially as described,' at the end of the claim. * * * The only possible distinction to be made is that in the one machine (the defendant's) the spring is attached to the plunger, which opens and closes the duct, while in the other (the plaintiff's) it is attached directly to the lever; but this is not material. In each construction the spring serves to hold both the valve and the lever in normal position, and both, against the resistance of the spring, are moved from normal position to open the valve. The same result is therefore accomplished by substantially the same means, acting in substantially the same way, which is sufficient."

To the same effect, we refer also to another case just decided. Diamond Match Co. v. Ruby Match Co. (C. C.) 127 Fed. 345.

In Dowagiac Mfg. Co. v. Minnesota Moline Plow Company et al., 118 Fed. 136, 55 C. C. A. 86, the court held that by changing the form of complainant's combination, and not essentially varying the principle or mode of operation, defendant cannot escape infringement.

In the case at bar, if the construction with reference to the wires running over the plate should be held to be an improvement on complainant's device, this fact of improvement does not permit the defendants to appropriate the invention of the patents in suit. In Electric Smelting Co. v. Reduction Co. (C. C.) 125 Fed. 926, the court says:

"He [the defendant] does not acquire the right to use the Bradley process simply because he has improved that process. He is entitled to enjoy what

is his, but in so doing he cannot appropriate the property of another. * * * If the inventor produces a new and useful result, he does not lose his reward because he or some one else subsequently renders it more useful."

Taking the whole case together, in the light of the decisions under the patent law, we are of the opinion that the defendants have infringed.

The evidence as to the actual sale of the crossing of the defendants is very slight, but there is some evidence of such sale, and it is not denied by any witness. The device sold did not include the electric conductors, but it was clearly adapted to be used with them, although they had not been attached. The case seems to us to present an instance of contributory infringement, like that in Bishop & Babcock Co. v. Levine (C. C.) 119 Fed. 363, 365, where Judge Lacombe, for the Court of Appeals of the Second Circuit, says:

"As it leaves defendant's hands, the cabinet is not the completed structure of the patent. It is made and sold, however, adapted to receive pipes and faucets so as to become an operative apparatus. Its parts are so arranged that, when these are inserted, it will be such a structure as the patent describes and claims. Without this adaptability it could not be sold at all, for it would have no commercial utility. That the defendant knows this, and that he makes and sells his 'shell' with the intention that it shall thus be fitted with pipes and faucets, seems entirely clear. He is a contributory infringer, under all the authorities."

In the case at bar there is certainly as much reason as in the case which we have just cited to hold the defendants as contributory infringers. Taking the whole case, we come to the conclusion that both patents are valid, and have been infringed by the defendants.

A decree is to be entered for complainant for an injunction and for an accounting.