GENERAL ELECTRIC CO. v. ALLIS–CHALMERS CO.

(Circuit Court, D. New Jersey. June 5, 1911.)

**1.** PATENTS (§ 328\*)—INVENTION—GOVERNOR FOR AIR COMPRESSING MOTOR.

The Stewart patent, No. 745,683, for a pneumatic governor for electrically driven air pumps or compressors, is void for lack of invention in view of the prior art.

**2.** PATENTS (§ 328\*)—VALIDITY AND INFRINGEMENT—GOVERNOR FOR AIR COMPRESSING MOTORS.

The Macloskie patent, No. 826,341, for a pneumatic governor for electrically driven air compressers, was not anticipated and discloses invention; the device being the first to be entirely commercially successful; also *held* infringed.

*\*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes*

3. Patents (§ 73*)—Anticipation—Date of Anticipating Invention.

The date when a patent is actually issued, rather than the date when the application therefor was filed, determines whether or not it anticipates another patent.

[Ed. Note.—For other cases, see Patents, Dec. Dig. § 73.*]

In Equity. Suit by the General Electric Company against Allis-Chalmers Company for infringement of two patents. Decree for defendant as to one patent, and for complainant as to the other.

L. F. H. Betts and James J. Cosgrove, for complainant.

Thomas F. Sheridan and Clifton V. Edwards, for defendant.

CROSS, District Judge. By the bill of complaint in this cause there is brought before the court for consideration two patents owned by the complainant, which, it is claimed, have been infringed by the defendant. The first, No. 745,683, was issued December 1, 1903, to Samuel B. Stewart, Jr., assignor to the complainant, the second, No. 826,341, was issued July 17, 1906, to George Macloskie, assignor to the complainant. Each of them is for a fluid pressure or pneumatic governor. They are designed to control the electric circuit of an electric motor, which drives an air compressor for the purpose of storing compressed air in a reservoir designed for that purpose, which air is used in operating the air brakes of an electric car or train of cars. For that purpose, the air pressure in the reservoir must be maintained within certain prescribed limits, say between 80 and 90 or 85 and 95 pounds pressure per square inch. If the air pressure were allowed to fall much below the minimum pressure indicated, it would be insufficient to effectively operate the air brakes, whereas, if allowed to greatly exceed the maximum pressure, the motor would be gradually slowed down and burned out. Hence a pneumatic governor is essential to open or close the electric current to stop or start the motor operating the air compressor when the maximum or minimum air pressure has been reached. The governor is designed to maintain the air pressure in the reservoir within certain defined limits. The testimony shows that it is desirable that the contacts of such a governor should be firmly pressed together when in their closed position, in order to avoid "chattering" which causes them to burn and pit or roughen as the result of arcing. The means for providing this constant pressure must be such, however, as will not prevent a quick opening of the switch at the proper time.

[1] The patents above mentioned will be considered in their order: Stewart described his invention in the following language:

"This invention relates to governors for electric motor-driven air pumps or compressors, the object being to maintain in an auxiliary reservoir or other holder for compressed air a pressure comparatively uniform and to cut in and out of operation the motor at determinate pressure-limits in the system. It is usual to cut in and out the electric motor which drives the pump after the pressure has fluctuated over a definite-operating range, ordinarily fixed at ten pounds. The working range of pressure is ordinarily from eighty to one hundred pounds, the governor being capable of adjustment so that the motor can be cut in when pressure declines to eighty or eighty-five pounds

and cut out when it reaches ninety or ninety-five pounds. Various devices have heretofore been designed to control the pressure in this way, sometimes being mechanically actuated by air-pressure at both limits and sometimes being governed by electromagnets cut in by a fluctuation of pressure."

"My invention relates to a type in which the circuit-controller which governs the motor-circuit is mechanically actuated by a rise and decline of pressure in the system, the object of the invention being to render the arc at the opening points of contact harmless and to lock the movable parts of the apparatus against derangement by shocks, vibration, or other accidental causes.  *  *  *

"One of the essential features of my invention consists in storing energy in a freely-movable contact while the pressure is fluctuating, which at a determinate position acts to open the circuit with great rapidity, as contradistinguished from a lock which prevents the movement of the contact until a definite position is reached."

He then indicates a distinction between the patent in suit and a prior patent of his for a circuit-controller. The patent under consideration has six claims, of which only 3 and 5 are in issue. They are as follows:

"3  A governor for an electrically-operated air pump comprising a pressureflexed diaphragm, a movable circuit-controller, a controlling-spring operated by the diaphragm and adapted to be shifted off center to operate the controller, and means for engaging the controller-arm to mechanically force the contacts apart if fused or otherwise locked together."

"5.  A governor for air electrically-operated air-pump comprising a pressure-operated piston, a movable circuit-controller a controlling-spring adapted to be shifted off center on determinate change of pressure to operate the circuit-controller, and a stop engaged by the piston if the spring fails to separate the contacts to positively separate them."

The defendant claims that the prior art anticipated this patent, or, if not, that the defendant's apparatus does not infringe it.

The complainant's expert practically admits that whatever of novelty is shown in this patent resides in the last clause of each of the claims. This is his language:

"To my way of thinking, the question of novelty or lack of novelty of the matter referred to in Stewart's claims 3 and 5 is simple and definite, depending largely upon the feature referred to in claim 3 as 'means for engaging the controller arm to mechanically force the contacts apart if fused or otherwise locked together,' or the corresponding feature referred to in claim 5 as 'a stop engaged by the piston if the spring fails to separate the contacts to positively separate them.'

"It seems to me a definite and explicit question whether such an emergency circuit-opener is or is not present in a governor such as Stewart's with a controller spring operated by the diaphragm and adapted to 'be shifted off center to operate controller,' it being understood that such a controller without the emergency circuit-opener was old prior to Stewart."

After an examination of the prior art, it seems to me that the foregoing admission was clearly justified. If the patent in question discloses novelty, it resides in the means provided for positively opening the circuit by forcing the contacts apart when fused or otherwise fastened together; but in my judgment this feature is wholly lacking in novelty and invention. In view of the disclosures of the prior art, it required no invention to provide means for positively effecting such a result. An application of ordinary mechanical skill was sufficient for the purpose. With the necessary power present and operat-

ing through the diaphragm, all that it required was an application of that power in some positive way, as, for instance, by an arm or rod or lever, to reach and force the contacts apart. Laying aside the disclosures of the prior art, this of itself would seem an easy problem and one capable of solution by an ordinarily skilled mechanic, and that, too, without making any heavy draft upon his inventive faculty, while, if he were instructed by that art, he would be able to solve it at sight. No special discussion of prior patents will be attempted. Reference is made, however to Binswanger, No. 485,028, 1892; Hewlett, 671,278, 1901; Bernardini, 620,839, 1899; Blake 520,722, 1894; Wilson, 588,306, 1897; and Whittier, 497,563, 1893.

The means adopted by Stewart for positively forcing the contacts apart is, at the most, but a mechanical variation of means which, if not obvious, had previously been both suggested and applied to accomplish the same purpose. This patent is invalid, and as to it the bill will be dismissed.

[2] The nature and object of the second patent in suit, that to Macloskie, is set forth by him in his specification in the following language:

"One of the distinguishing features of this type consists in having the arm which carries the movable contact connected to a strained spring, acting under either tension or compression, which may be carried on opposite sides of the pivoted point of the arm through the agency of a diaphragm or other means subjected to fluid-pressure. In governors of this type heretofore proposed the construction is such that the movements of the spring and diaphragm are substantially simultaneous. In the act of breaking the motor circuit this simultaneous movement causes the pressure between the controller-contacts to fall off some time before the actual break takes place. This is a serious objection, since it causes destructive pitting and fusing of the contacts. The principal object of the present invention is to provide a governor of this type in which when breaking the circuit, the pressure between the contacts of the controlling-switch will be maintained substantially uniform throughout practically the entire range of movement of the diaphragm. This is accomplished specifically by providing mechanism which will at first take up the movement of the diaphragm without changing the position of the tension spring and will cause the spring to move to a position to open the controlling-switch."

Of its ten claims, the first three only are in issue. They are as follows:

"In a switch mechanism, the combination of switch-contacts, a strained spring for maintaining a definite pressure between said contacts, a movable member, and means for transmitting motion from said member to said contacts by initially taking up the movement of said member without decreasing the pressure between said contacts and subsequently moving said spring to a position to separate said contacts.

"2. In a fluid-pressure governor, the combination of a pressure-diaphragm, a switch-arm, a strained spring tending to hold said arm in a definite position, and means for transmitting motion from said diaphragm to said arm by initially taking up the movement of said diaphragm without changing the position of said spring and subsequently moving said spring to a position to move said arm from its initial position.

"3. In a switch-mechanism. the combination of a pivoted switch-arm having a limited movement, a strained spring tending to hold said arm in either limiting position, a movable member, and motion-transmitting means operated by the movement of said member in one direction to initially take up said

movement without changing the position of said spring and subsequently to move said spring to a position to move said switch-arm and by the movement of said member in the opposite direction to move said spring to a position to return said switch-arm."

The device of the patent has proved to be commercially successful, and is the only one now used by the complainant. Several governors of types found in the prior art were from time to time manufactured and sold by it in the course of its business, but none of them, however, proved entirely satisfactory. Speaking of them and of the other patents in the prior art, the counsel of complainant makes the following claim:

"An examination of these prior paper patents and the prior unsuccessful commercial structures will show that Macloskie's three claims in suit are broadly new and that Macloskie was, in fact, the first in the art of governors to

"(1) Provide mechanism of any sort or description which would first 'take up' or compensate for the initial movements of the diaphragm and the creeping movement of the piston without changing the position of the switch-operating spring. and which mechanism would then cause the spring to move to another position to separate the contacts and abruptly open the controlling switch at the critical time.

"(2) The first to produce a pneumatic governor in which a definite, uniform and adequate pressure was maintained between the switch contacts throughout the period the circuit was required to be closed.

"(3) The first to produce an entirely commercially successful pneumatic governor."

The object of the patent under consideration cannot be more clearly stated than was done by Macloskie himself in the last paragraph above quoted from the specification. It should be additionally noted, however, at this point, that in such specification he also says:

"That the mechanism I have devised for operating the switch-arm is capable of general application to switches and should not be limited to those which are pneumatically operated, and that many modifications and alterations may be made in the specific form illustrated, and I therefore do not wish to be limited to such specific construction."

It is claimed on behalf of the defendant, however, that in view of the prior art the patent is invalid, or, if valid, that its claims must be so narrowly construed that they will not embrace the defendant's device. The patents upon which the defendant's expert chiefly relies to show anticipation, and the only ones which he discusses, are five in number, as follows: Dewson No. 798,270 of August 29, 1905, Cowles No. 681,625 of August 27, 1901, Libby and Potter No. 613,692 of November 8, 1898, Briggs No. 452,359 of May 19, 1891, and Merritt No. 571,600 of November 17, 1896, and in the progress of his examination, while claiming that the patents to Cowles, Dewson, and Briggs contain in substance the elements of the Macloskie claims, he admits that the Libby and Potter patent and the Merritt patent do not of themselves describe all of the elements of claims 1, 2, and 3 of the patent in suit. Under the circumstances, Libby and Potter and Merritt will not be considered further than to say that neither of them has any strained spring to operate the switch and maintain a constant pressure between the contacts. Libby and Potter shows a dead-centered

spring such as may be found in several patents in the prior art. Such a spring does not maintain adequate and uniform pressure upon the contacts, for the reason that, while it is being moved gradually towards a dead-center position, it gradually and necessarily loses its leverage and consequently its power to maintain adequate spring power and pressure between the contacts. In the Merritt patent there is also lacking the element of the strained spring of the claims in issue. He, moreover, operates his switch by a piston, whereas the strained spring of Macloskie both operates the switch and maintains pressure between the contacts.

[3] The complainant contends that the disclosure of the Dewson patent is too late to be considered as an anticipation, since, although his application was filed first, the patent itself was not issued until nearly two years after Macloskie's application was filed. Under the authorities, the date when a patent is actually issued, rather than the date when the application therefor was filed, determines whether or not it anticipates another patent. Diamond Drill Co. v. Kelly Bros. (C. C.) 120 Fed. 282, 287; Eck v. Kutz (C. C.) 132 Fed. 758, 764; Union Typewriter Co. v. Smith & Bros. (C. C.) 173 Fed. 288, 291; Ajax Metal Co. v. Brady Brass Co. (C. C.) 155 Fed. 409, 415; Barker v. Stowe, 15 Blatchf. 49, Fed. Cas. No. 994; Thomson-Houston Electric Co. v. Ohio Brass Co. (C. C.) 130 Fed. 542; Bates v. Coe, 98 U. S. 31, 33, 25 L. Ed. 68.

The rule referred to is founded on reason. The filing of an application without evidence of open use affords no element of publicity. But disregarding that point, and considering the Dewson patent as a part of the prior art, it will be found that it does not disclose the invention of Macloskie. The device of the Dewson patent is similar to those of the Merritt and Libby and Potter patents, in that the switch is operated by a piston within a cylinder, and the admission of air to that cylinder is controlled by another cylinder containing a pressure-actuated diaphragm. Macloskie has but one cylinder and diaphragm. Furthermore, Dewson uses a sliding contact switch or what is called a creeping contact, which the evidence shows is ineffective. He has no equivalent of the "strained spring" of the patent in suit. He, however, does show a spring which the defendant claims is the equivalent of the Macloskie strained spring, but as a matter of fact it does not perform the same function, nor does it operate in the same way. This is clearly demonstrated by one of the complainant's experts. This patent may be dismissed with the further remark that its spring moves slowly in step with the creeping movement of the diaphragm and piston, which is wholly unlike the action of the strained spring called for by the claims of the patent in suit.

The Cowles device, like Dewson, has two cylinders. The springs employed do not affect the pressure between the contacts. Furthermore, they move in step with the diaphragm and piston. It discloses no spring or springs which operate the contacts while at the same time uniform pressure is maintained between them.

The Briggs patent shows a manual switch of the ordinary knife-blade variety. It operates by means of a dead-center spring. It does not

have the strained spring of the patent in suit, nor is there any way provided whereby the gradual weakening of the operating spring as it approaches the dead-center position is counteracted.  It differs from the Macloskie patent in substantially the same respects that the Cowles and Dewson patent differ from it.   As already stated, numerous other patents of the prior art are claimed to be anticipations, but they will not be considered for the reason that no one of them discloses the features of the combination claims in issue.   Moreover, Macloskie seems to have been the only one who successfully solved the problem in question.

The only point remaining for consideration is whether the defendant's device infringes the claims in issue.   Defendant's expert admits that its device comes within the terms of such claims, but maintains nevertheless that the two types of apparatus, the complainant's and defendant's, are entirely different in their organization.   The defendant has advertised its device in the following language:

"This new device, known as our type 'OB' pneumatic governor, is illustrated on the title page and shown in detail farther along.  One of its chief merits is the simplicity of design.  There are no small ports, slides or check valves such as have ever been a source of trouble in the ordinary automatic governor.  It is also very positive in its operation.  For example, the switch arm, engaged by the pressure piston is held in contact by our special spring device until the instant of the quick 'snap' break, and this, together with a powerful magnetic blow-out made in accordance with the latest designs, absolutely prevents sparking or burning of contacts and consequent pitting."

Its device has the strained spring of Macloskie, which, although attached differently, operates nevertheless to hold the switch-arm in a definite position, and maintain definite and uniform pressure between the contacts when the switch is closed.   Moreover, it does not change its position during the slow movement of the piston until the time arrives for breaking the circuit.   The defendant's expert admits this, as the following question and answer will show:

"In the defendant's structure does the lower compressed spiral spring strain or change its position in the initial movement of the diaphragm or the stem? A. No."

He also admits that when the time arrives for the switch to open the circuit that the switch then changes its position for that purpose. The similarity of the two devices is in a general way clearly stated by the complainant's expert in the following language:

"Macloskie's 'switch-contacts' are the contacts 22, 23 which obviously correspond to the 'main contacts' of the defendant.  Macloskie's 'strained spring' is the spring 29 and in the defendant's device a corresponding one is the 'lower compressed spiral spring.'  Macloskie's 'movable member' is one of the parts operated by the air pressure, for instance, the piston rod 20 which corresponds to the 'piston or stem' of the defendant."

"Macloskie's means for transmitting motion," etc., is the series of levers by which the movable member makes its initial movement without affecting the spring 29 and the action of the spring on the contacts, while in the defendant's governor the corresponding "means" is the system of levers by which the initial movement of the said movable mem-

ber is provided for without affecting the action of the strained spring upon the contacts. While these means are specifically different in the defendant's device from those of Macloskie, yet they are equivalent therefor and the actual resemblance is closer than appears at first glance, there being in each case a lever immediately acted upon by the piston-rod, to wit, rock lever 26 of Macloskie and lever 8 of defendant, which trips a second lever, to wit, the intermediate lever 27 of Macloskie and the hammer, lever, 7 of the defendant, while this second lever, in turn, trips the contact lever, which is the lever 28 Macloskie and the contact arm of the defendant.

The defendant's device embodies all the elements of the patent in suit, operating in substantially the same way to perform the same results. While the devices are not altogether similar in appearance, it is nevertheless true that wherein the defendant's differs from the complainant's it differs by the substitution of mechanical equivalents. It seems perfectly clear that what the defendant is using was not found in the prior art, but with immaterial and unimportant mechanical variations is found in, and was taken from the Macloskie patent. It is unnecessary to say more. The defendant has infringed claims 1, 2, and 3 of that patent; and as to it a decree will be entered in favor of the complainant, pursuant to the prayer of its bill of complaint, while as to the Stewart patent the bill will, as above stated, be dismissed.